**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ALIGNMENT HEALTHCARE, INC.
1100 W. Town and Country Road, Suite 1600
Orange, CA 92868,

ALIGNMENT HEALTHCARE USA, LLC
1100 W. Town and Country Road, Suite 1600
Orange, CA 92868,

ALIGNMENT HEALTH PLAN
1100 W. Town and Country Road, Suite 1600
Orange, CA 92868,

ALIGNMENT HEALTH PLAN OF ARIZONA, INC.
1100 W. Town and Country Road, Suite 1600
Orange, CA 92868,

ALIGNMENT HEALTH ADVANTAGE PLAN, INC.
1100 W. Town and Country Road, Suite 1600
Orange, CA 92868,

ALIGNMENT HEALTH PLAN OF NEVADA, INC.
1100 W. Town and Country Road, Suite 1600
Orange, CA 92868,

*Plaintiffs*,

v.

DEPARTMENT OF HEALTH AND HUMAN SERVICES
200 Independence Avenue, S.W.
Washington, DC 20201,

CENTERS FOR MEDICARE & MEDICAID SERVICES
7500 Security Boulevard
Baltimore, MD 21244,

Civil Action No. 1:26-cv-3550

| |
|---|
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>MEHMET OZ, in his official capacity as Administrator, Centers for Medicare & Medicaid Services<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>*Defendants*. |

**<u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

Plaintiffs Alignment Healthcare, Inc.; Alignment Healthcare USA, LLC; Alignment Health Plan; Alignment Health Plan of Arizona, Inc.; Alignment Health Advantage Plan, Inc.; and Alignment Health Plan of Nevada, Inc. (collectively, "Alignment") bring this suit against Defendants the United States Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official capacity as Secretary of HHS; the Centers for Medicare & Medicaid Services ("CMS"); and Mehmet Oz, in his official capacity as Administrator of CMS, and allege as follows:

**PRELIMINARY STATEMENT**

1. Alignment brings this action to remedy CMS's unlawful determination of Alignment's 2027 Star Ratings in flagrant violation of CMS's governing statute.

2. Alignment is a mission-driven Medicare Advantage organization dedicated to delivering high-quality, compassionate care to its more than 235,000 members.

3. Alignment integrates clinical, pharmacy, and other member-specific data to drive improved outcomes and more personalized care for seniors.

4. Alignment also provides 24/7 access to an on-call care team and operates the ACCESS On-Demand Concierge program, helping members meet routine and emergent health needs while reducing upfront barriers.

5. Alignment's focus on identifying health risks earlier, coordinating care more effectively, and maintaining close engagement with members has produced consistently strong quality outcomes. Through its physician-led and technology-enabled care model, Alignment seeks to intervene before serious health events occur, helping seniors remain healthier and more independent while reducing avoidable utilization of high-cost healthcare services. Alignment's commitment to innovation, operational excellence, and high-quality care was further recognized in 2026 when it was named to Fortune's World's Most Admired Companies™ list in its first year of eligibility.

6. Alignment's model of care has produced a track record of excellent healthcare delivery. In 2026, 100% of Alignment members were enrolled in plans that CMS rated 4 Stars or higher (out of a possible 5 Stars), for the second consecutive year. And Alignment was recognized as a 2026 Best Insurance Company for Medicare Advantage by U.S. News & World Report across all five states it serves—Arizona, California, Nevada, North Carolina, and Texas.

7. Alignment's track record is also reflected in the health outcomes for its members. In 2025, Alignment reported 34% fewer emergency room visits, 34% fewer inpatient admissions, and 44% fewer skilled nursing facility admissions per 1,000 members when compared to 2019 Medicare benchmarks.

8. Through the Medicare Advantage program, Congress authorized the Secretary of HHS, acting through CMS, to contract with private health plans like Alignment to provide

Medicare-covered benefits that meet or exceed the benefits provided by government-run Medicare. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251, 275-327 (1997).

9. Each plan's "Star Rating" is the central tool that Congress provided to promote competition among Medicare Advantage health plans. A plan's Star Rating is a score of between 1 and 5 Stars, including half-Stars in between, on a range of quality measures for each plan, and is intended to promote transparency as to plan quality and help seniors to choose high-quality plans.

10. A plan's Star Rating not only is critical to a plan's market position, but it also determines the payments that the plan receives from CMS for providing healthcare services to members.

11. By statute, the financial consequences from just a single half-Star change in a plan's overall Star Rating can easily amount to hundreds of millions of dollars for an individual plan, and, taken together across all plans, billions of dollars across the Medicare Advantage program. Moreover, Medicare beneficiaries, agents, and brokers rely on Star Ratings to compare plans and inform enrollment decisions. Consistent application of the statutory requirements governing Star Ratings is therefore essential not only to plan payments and competition, but also to ensuring that beneficiaries can rely on the Star Ratings as meaningful and comparable measures of plan quality.

12. Congress directed CMS to determine Star Ratings based on clinically validated measures of healthcare quality, such as the percentage of plan members who receive medically recommended preventative screenings. Alignment shares Congress's vision for transparent, easy-to-understand Star Ratings that allow seniors to make informed decisions and select the plans that provide the highest standards of clinical care and outcomes to American seniors.

13. Yet CMS has completely departed from Congress's vision of leveraging predictable, valid measures developed with input from providers, plans, and the public.

14. Rather than codifying consistent, stable specifications for its chosen measures in the Code of Federal Regulations through notice-and-comment rulemaking as CMS's enabling statute requires, CMS has instead promulgated its measures and their specifications as hundreds of pages of unilateral, sub-regulatory guidance, known as "Technical Notes," that CMS purports to modify each and every year at its discretion.

15. Congress's own nonpartisan advisory body, the Medicare Payment Advisory Commission, has confirmed that the resulting system is "overly complex," "distributes financial rewards inequitably," and "reports inaccurate information on quality."[1]

16. Indeed, federal courts have begun to take notice of CMS's stark departures from the quality system that Congress envisioned.

17. In 2024, two different judges of this Court held that CMS's unilateral changes in CMS's required benchmarks for "good" performance violated CMS's own regulations. *See SCAN Health Plan v. HHS*, No. 1:23-cv-3910-CJN, 2024 WL 2815789, at *1 (D.D.C. June 3, 2024) (Nichols, J.); *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 25 (D.D.C. 2024) (Moss, J.).

18. As those cases identified, CMS had suddenly changed the rules on plans for what constituted "5-Star" or "4-Star" or "3-Star" performance at the last moment *after* plans had already designed their benefits to conform to CMS's requirements and *after* the quality data at issue had already been collected from plans, violating CMS's own binding regulations in the process.

19. Two years later, on May 27, 2026, the United States District Court for the Southern District of Georgia issued a detailed, 70+ page opinion holding that CMS's ever-shifting regulatory

[1] Medicare Payment Advisory Comm'n, Replacing the Medicare Advantage Quality Bonus Program, in Report to the Congress: Medicare and the Health Care Delivery System, ch. 3 at 51 (June 2020), https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/jun20_ch3_reporttocongress_sec.pdf.

approach, now in determining a plan's 2026 Star Ratings, suffered multiple similar infirmities. *Clover Ins. Co. v. HHS*, No. 2:25-cv-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026).

20. First, the court found that ten of CMS's Star Ratings measures fell totally outside the statutory authority Congress granted CMS to adopt measures of plan quality. *Id.* at *8-14.

21. Second, the court held that a separate set of ten measures was procedurally invalid because CMS never promulgated those measures "by regulation" as required by 42 U.S.C. § 1395hh(a)(2) for such measures that govern payments to plans for their services. *Id.* at *22-25.

22. On June 17, 2026, CMS announced that it would recalculate Star Ratings by applying the *first* holding in *Clover* (the removal of the ten measures that the court had identified as in excess of CMS's statutory authority) to certain plans and offering them the option, but not the requirement, to "opt into" a recalculated Star Rating under that first holding. CMS, *Update to 2027 Quality Bonus Payment Determinations* (June 17, 2026) ("Recalculation Memo").[2]

23. CMS, however, inexplicably refused to give all plans the benefit of the *second* holding from the Southern District of Georgia, namely, the removal of the ten measures that the court had identified as having been promulgated by CMS in its unilateral program guidance, rather than "by regulation" in the manner required by 42 U.S.C. § 1395hh(a)(2).

24. Recognizing that the Southern District of Georgia's second holding was plainly correct, Alignment and two other health insurance plans each separately sued CMS in 2026, seeking to vacate their respective 2026 Star Ratings and require CMS to recalculate them without reliance on the measures in *Clover*'s second holding, with corresponding rebate relief. *Alignment Healthcare, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-02441-CRC, ECF Nos. 1, 13

---

[2] CMS also removed some measures that it apparently concluded (without explanation) were encompassed by the reasoning of the first *Clover* holding despite the Georgia federal court not reaching them. *Id.*

(D.D.C. 2026); *SCAN Health Plan v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-02391-CRC, ECF Nos. 1, 11 (D.D.C. 2026); *Elevance Health, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 2:26-cv-00061-LGW-BWC, ECF Nos. 1, 46 (S.D. Ga. 2026).

25. This action arises from the same defect, applied in determining the next year's Star Ratings: Once again, CMS has used the same ten measures in calculating Alignment's 2027 Star Ratings without first promulgating them "by regulation," as Congress expressly required. Indeed, the legality of CMS's use of these same measures is already before this Court in Alignment's pending challenge to its 2026 Star Ratings. CMS's continued reliance on those measures for 2027 presents the same legal question, governed by the same statutory requirement that controlled in *Clover*.

26. Under 42 U.S.C. § 1395hh(a)(2), any "rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits," must be promulgated "by regulation," that is, formal rulemaking and publication in the Code of Federal Regulations.

27. The Supreme Court has recognized that Congress imposed this heightened procedural requirement on CMS precisely because of the dramatic consequences that decisions regarding Medicare carry for the healthcare system as a whole. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019).

28. As the Southern District of Georgia held, the ten measures that Clover challenged were required to be promulgated "by regulation." Because CMS had not done so, they could not be applied to Clover.

29. In particular, the court found the specifications for determining those ten measures amounted to "substantive legal standard[s]" that "govern[ed] the payment for services because they serve[d] as a 'deciding principle' for such payments." *Clover Ins. Co.*, 2026 WL 1483515, at *24.

30. That is, because Star Rating measures directly determine the statutorily prescribed payments that Medicare Advantage plans receive—often amounting to hundreds of millions of dollars for a single plan based solely on the plan's Star Rating—they establish substantive legal standards governing payment for services. *See id.*

31. Because the court found that the ten measures Clover challenged had not been promulgated "by regulation" through the statutorily prescribed notice and comment process, the court ordered CMS to recalculate Clover's Star Rating without reliance upon them. *Id.* at *25.

32. On October 6, 2026, Alignment requested that CMS re-determine its 2027 Star Ratings for its plans H3815, H8832, H3443, and H9686 without reliance on the ten measures that the Southern District of Georgia held to be unlawful under 42 U.S.C. § 1395hh(a)(2) and that Alignment had previously challenged on that same basis in its 2026 suit against CMS.

33. On October 7, 2026, CMS summarily denied the request. Accordingly, before finalizing Alignment's 2027 Star Ratings, CMS was aware of the *Clover* decision, Alignment's pending challenge to the same measures, and Alignment's objection to their continued use. Nevertheless, despite multiple opportunities to cure the defect before finalizing the ratings, CMS again applied the ten measures without promulgating their specifications through notice-and-comment rulemaking.

34. CMS's decision to assign these plans 2027 Star Ratings of 3.5 Stars (Contract No. H3815) and 4.0 Stars (Contract Nos. H8832, H3443, H9686), rather than 4.0 and 4.5 Stars in

accordance with the *Clover* court's second holding, deprives Alignment of well over $200 million of statutorily mandated payments that Alignment could use to increase benefits or reduce cost sharing for its members, improving its competitiveness and profitability.

35. And CMS's publication of lowered Star Ratings for these plans also imposes significant reputational and competitive harms on Alignment.

36. More fundamentally, Congress created the Star Ratings program to allow Medicare Advantage beneficiaries to make informed decisions about plan enrollment based on clinically validated measures of plan quality that had been subjected to notice and comment. CMS's contrary approach fails to carry out the vision that Congress set forth by statute.

37. Alignment thus brings this action and requests that the Court vacate Alignment's 2027 Star Ratings for its plans H3815, H8832, H3443, and H9686, and order CMS to recalculate those Star Ratings without reliance on the ten unlawful measures identified herein.

38. That leaves the matter of timing. Historically, CMS took the position that it needed a decision in advance of the annual June Medicare Advantage bidding deadline to provide efficient and efficacious relief.[3] More recently, CMS has taken conflicting and inconsistent positions on this issue, including the necessary timing and willingness to take the necessary operational steps to award rebate relief required under the governing statute. Given this history, Alignment will

---

[3] *See Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 13 (D.D.C. 2024) ("Both parties have requested expedited consideration of . . . summary judgment in light of Plaintiffs' impending deadline to submit their bids to CMS for the upcoming contract year."); Joint Motion for Briefing Schedule at 1, *SCAN Health Plan v. Dep't of Health & Hum. Servs.*, No. 1:23-cv-3910-CJN (D.D.C. Feb. 23, 2024), ECF No. 19 ("The parties have developed this scheduling proposal to allow for expedited summary judgment briefing in advance of the June 3, 2024 deadline for Medicare Advantage bids . . . ."); Notice of Joint Proposed Briefing Schedule at 4, *Clover Ins. Co. v. Becerra*, No. 1:24-cv-01385-BAH (D.D.C. June 7, 2024), ECF No. 12 (similar).

seek to confer with Defendants on this issue to promptly establish an appropriate briefing schedule that allows for a final decision by May 2027.

## PARTIES

39. Alignment Healthcare, Inc. is a leading provider of Medicare Advantage health insurance plans. It is incorporated in Delaware and has its principal place of business in California.

40. Alignment Healthcare USA, LLC is a subsidiary of Alignment Healthcare, Inc. It is incorporated in Delaware and has its principal place of business in California.

41. Alignment Health Plan is a subsidiary of Alignment Healthcare, Inc. It is incorporated in California and has its principal place of business in California.

42. Alignment Health Plan of Arizona, Inc. is a subsidiary of Alignment Healthcare, Inc. It is incorporated in Arizona and has its principal place of business in California.

43. Alignment Health Advantage Plan, Inc. is a subsidiary of Alignment Healthcare, Inc. It is incorporated in California and has its principal place of business in California.

44. Alignment Health Plan of Nevada, Inc. is a subsidiary of Alignment Healthcare, Inc. It is incorporated in Nevada and has its principal place of business in California.

45. HHS is a department of the Executive Branch of the United States. Its headquarters and principal place of business are at 200 Independence Avenue, S.W., Washington, DC 20201. Its governmental activities occur nationwide.

46. Robert F. Kennedy, Jr., sued solely in his official capacity, is Secretary of HHS. In this capacity, Secretary Kennedy has ultimate responsibility for activities at HHS, including the actions complained of herein. His governmental activities occur nationwide.

47. CMS is a federal agency within HHS. Its headquarters and principal place of business are at 7500 Security Boulevard, Baltimore, MD 21244. Its governmental activities occur nationwide.

48. Dr. Mehmet Oz, sued solely in his official capacity, is Administrator of CMS. In this capacity, Administrator Oz has ultimate responsibility for activities at CMS, including the actions complained of herein. His governmental activities occur nationwide.

**JURISDICTION, VENUE, AND EXHAUSTION**

49. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

50. This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 and the United States Constitution. Alignment's prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA, 5 U.S.C. §§ 701-706; and 28 U.S.C. § 1361.

51. Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Defendant is an officer or agency of the United States and resides in this District.

52. Any requirement for administrative exhaustion has been satisfied. CMS allows plans to examine the data used to calculate their Star Rating and appeal certain determinations. It does not, however, allow plans to challenge "the methodology for calculating the star ratings." 42 C.F.R. § 422.260(c)(3)(ii). Thus, any challenge to the lawfulness of measures applied to a plan is not subject to any administrative review process. *See SCAN Health Plan*, 2024 WL 2815789, at *4 n.3. Nevertheless, Alignment raised its concerns about the use of these measures to determine Alignment's 2027 Star Rating to CMS through a submission on October 6, 2026, objecting to CMS's calculation of the 2027 Star Ratings through application of the ten disputed measures that had not been promulgated "by regulation" (C03, C04, C05, C15, C16, C21, C22, C23, C24, and C26). CMS responded the next day, refusing to grant Alignment its requested relief or determine Alignment's Star Rating in accordance with its objections.

## BACKGROUND

### A. The Medicare Advantage Program

53. The Medicare program is the federal health insurance program for people aged 65 or older or with certain disabilities or end-stage renal disease. *See Medicare Program; Establishment of the Medicare Advantage Program*, 70 Fed. Reg. 4588 (Jan. 28, 2005); 42 U.S.C. § 1395kk(a).

54. Medicare is comprised of Parts A, B, C, and D. *See* 70 Fed. Reg. at 4589. Part A covers inpatient hospital treatment, and Part B covers outpatient services. Together, they are known as "traditional" or "original" Medicare.

55. Traditional Medicare uses a fee-for-service payment model. *See* 42 U.S.C. § 1395w-22(a)(1). CMS thus reimburses providers directly for the services they provide to traditional Medicare beneficiaries. *UnitedHealthcare Insurance v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021).

56. Medicare Part C, also known as Medicare Advantage, uses a different model. *See* Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified at 42 U.S.C. §§ 1395w-21 to 1395w-28).

57. In Part C, private companies, called Medicare Advantage organizations, offer plans. These companies must provide at least the same services that Medicare beneficiaries would receive through traditional Medicare. 42 U.S.C. § 1395w-22(a). But to attract enrollees, Medicare Advantage plans typically include additional benefits not covered by traditional Medicare, such as dental and vision benefits. *UnitedHealthcare*, 16 F.4th at 872.

58. Under this public-private partnership model, Medicare Advantage organizations do not receive fee-for-service reimbursements from CMS for the healthcare services their enrollees receive. *See generally* 42 U.S.C. § 1395w-23(a).

59. Instead, they receive a per-enrollee monthly payment to provide all Medicare-covered services to the beneficiaries enrolled in their plan. *Id.*

60. CMS determines a plan's monthly payment by comparing the plan's "bid" (its estimated cost of providing Medicare-covered services to a particular patient population) to a "benchmark" (the maximum amount the federal government will pay to provide coverage in the plan's service area). *Id.* § 1395w-23(b)(1)(B), (n).

61. If the Medicare Advantage organization's bid is below the benchmark, CMS pays the organization its bid, while returning a specified percentage of the difference between the benchmark and the bid as a "rebate," which the Medicare Advantage organization uses to provide additional benefits or otherwise return to plan participants through lower premiums or cost sharing (among other things). 42 U.S.C. §§ 1395w-23(a)(1)(B)(i), (E); 1395w-24(b)(1)(C).

62. If, in contrast, an organization's bid is at or above the benchmark, the Medicare Advantage organization receives monthly payments at the benchmark rate, and the Medicare Advantage organization must charge enrollees an additional premium to cover the amount by which the bid exceeds the benchmark. *Id.* §§ 1395w-23(a)(1)(B)(ii), 1395w-24(b)(2)(A); *see also Medicaid & Medicare Advantage Products Ass'n of P.R. v. Emanuelli Hernández*, 58 F.4th 5, 8 n.1 (1st Cir. 2023); *Elevance Health, Inc.*, 736 F. Supp. 3d at 5-6.

63. Typically, plans aim to bid, and do in fact bid, meaningfully below the benchmark, in order to remain competitive on both premiums and in funding supplemental benefits. (This is true of each plan at issue in this case.)

64. As detailed below, Star Ratings are the overriding determinant of each Medicare Advantage organization's plan-specific benchmark and rebate percentage, and, thus, Star Ratings determine the payments to the plan for the services it provides, and the benefits it can offer.

65. Indeed, just a half-Star increase can and does result in hundreds of millions of dollars in additional funding for a single plan, and billions of dollars across all plans.

66. In addition to inpatient treatment and outpatient services through traditional Medicare or Medicare Advantage, Medicare beneficiaries may also obtain prescription drug coverage through Medicare Part D.

67. Like the Medicare Advantage program, the Part D prescription drug benefit provides coverage through a public-private partnership with plan sponsors.

68. These plan sponsors offer both standalone prescription drug plans for individuals enrolled in traditional Medicare and drug coverage bundled with a Medicare Advantage plan, known as a Medicare Advantage-Prescription Drug plan. 42 U.S.C. § 1395w-101(a)(1), (3)(C).

69. Since their adoption in 2003, the Medicare Advantage and Part D programs have grown steadily. Most Americans prefer the choices that Medicare Advantage plans provide compared with traditional Medicare, and voluntarily elect enrollment in Medicare Advantage.

70. The immediate predecessor to Medicare Advantage, called Medicare+Choice, had approximately 1.56 million enrollees in 1992. *See* CMS, *Medicare Managed Care Contract (MMCC) Plans Monthly Report*, https://www.cms.gov/data-research/statistics-trends-and-reports/health-plans-reports-files-data/monthly. In recent years, that figure has increased to more than 35 million enrollees, surpassing the number of beneficiaries opting for traditional Medicare. Meredith Freed, et al., *Medicare Advantage in 2026: Enrollment Update and Key Trends* (June 5, 2026), https://www.kff.org/medicare/medicare-advantage-in-2026-enrollment-update-and-key-trends. And the Congressional Budget Office recently projected that 63% of Medicare beneficiaries would be enrolled in Medicare Advantage by 2034. *Id.*

**B. The Star Ratings System**

71. Each Medicare Advantage organization is required to establish "ongoing quality improvement program[s]." 42 U.S.C. § 1395w-22(e)(1), (3).

72. The Medicare Advantage statute prescribes a system of "quality rating[s]" for plans under a "5-star rating system," based on the data collected under Medicare Advantage organizations' quality improvement programs. *Id.* § 1395w-23(o)(4)(A).

73. Star Ratings are based on the scores that these plans earn on various quality and performance "measures." *See* 42 C.F.R. §§ 422.162(a), 423.182(a).

74. CMS first determines each plan's raw scores on each measure.

75. CMS then converts the raw scores into measure-level Star Ratings, and from there calculates each plan's overall Star Rating by running a weighted average of all measures. *See SCAN Health Plan*, 2024 WL 2815789, at *1-2.

76. Each plan receives a numerical score for each applicable measure, which CMS converts into a "measure-level" Star Rating on a five-star scale.

77. The scale uses four thresholds, or "cut points," to divide the measure scores into five "whole star increments." 42 C.F.R. §§ 422.166(a)(4), 423.186(a)(4).

78. From the measure-level Star Ratings, CMS calculates Part C and Part D "summary" ratings, which reflect the weighted mean of a contract's measure-level Star Ratings, with some measures counting more than others. *Id.* §§ 422.166(c), 423.186(c).

79. The Affordable Care Act incorporated Star Ratings into two statutory formulas that determine payments to Medicare Advantage plans. *See* § 1102(c)-(d), 124 Stat. at 1043-46.

80. The first formula, codified at 42 U.S.C. § 1395w-23(o) and known as the quality bonus payment, rewards Medicare Advantage plans rated 4 Stars or higher with an increased 5 percent benchmark against which to bid.

81. That effectively either increases the total amount of money the plan is eligible to receive, including in the form of a rebate (if its bid is below the benchmark) or reduces the premium the plan must charge its members (if its bid is above the benchmark).

82. The second formula, codified at 42 U.S.C. § 1395w-24(b)(1)(C), gives higher-rated plans a larger portion of the difference between their bid and their benchmark back as a rebate as follows: 3 Stars and lower receive 50 percent; 3.5 and 4 Stars receive 65 percent, and 4.5 and 5 Stars receive 70 percent. Rebates are used to lower patient cost sharing and premiums, and fund supplemental benefits not offered under traditional Medicare, such as dental and vision benefits. *See, e.g.*, 85 Fed. Reg. 33,796, 33,885-86 (June 2, 2020).

83. Congress provided that the "quality rating for a plan shall be determined according to a 5-star rating system (based on the *data collected under section 1395w-22(e) of this title*)." 42 U.S.C. § 1395w-23(o)(4)(A) (emphasis added).

84. That is, Congress required the Star Ratings to be based upon the data collected under plans' quality assurance programs as of November 1, 2003. *Id.* § 1395w-22(e)(3)(B)(i).

85. In this way, Congress required CMS to focus on well-established types of data concerning clinical quality, health outcomes, and beneficiary satisfaction. *See id.*

86. CMS prominently displays Star Ratings in its online and print resources concerning available Medicare Advantage plans.

87. Through the online Medicare Plan Finder tool, which provides information to beneficiaries about available plans, CMS displays Medicare Advantage plans to prospective enrollees in order of highest to lowest Star Ratings to guide beneficiaries to higher-rated plans first.

88. Medicare beneficiaries use the Star Ratings to assess the quality of the Medicare Advantage plans; and agents and brokers use the Star Ratings in assisting beneficiaries in selecting a plan that fits their health care needs. *Elevance Health, Inc.*, 736 F. Supp. 3d at 6-7.

89. Star Ratings thus influence each plan's position in the marketplace, by affecting how prospective enrollees perceive the comparative quality of various plans.

90. Star Ratings also determine whether a low-performing plan remains eligible to continue to participate in the program. *See* 42 C.F.R. §§ 422.502(b), 423.503(b).

**C. Notice And Comment On The Star Ratings Measures**

91. Pursuant to its unilateral program guidance, CMS considers 40 or more distinct "measures" of a plan's quality to derive the plan's Star Ratings from year to year.

92. CMS breaks those measures into multiple categories. Some measures reflect such issues as the plan's success in delivering preventive care like cancer screenings, and health outcomes of plan participants with respect to such conditions as blood pressure. Other measures rely on data drawn from a family of patient-experience surveys, known as the Consumer Assessment of Healthcare Providers & Systems ("CAHPS") surveys. Still other measures are CMS "administrative" measures about issues like the time it takes to process coverage appeals.

93. Critically, under CMS's current methodology, Star Ratings measures, and the specifications for *how* the measures are calculated (determined) by CMS, change each year.

94. Due to these "regular updates and revisions," CMS does not codify its Star Ratings measures in the Code of Federal Regulations, but rather lists out its measures for a given year in its annual Technical Notes. 83 Fed. Reg. 16,440, 16,537 (Apr. 16, 2018).

95. The Technical Notes provide a partial, summary description of the specifications for each measure, *i.e.*, the data sources on which it is based and how it is determined.

96. To actually determine each measure, however, it is necessary to utilize the detailed

specifications contained in CMS's other sub-regulatory guidance, including specific "Technical Notes" pertaining to each measure. *See, e.g.*, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2022) (partially specifying calculation of two measures, among other sources of guidance).

97. For the 2027 Star Ratings, CMS originally utilized 32 measures for Part C ("C01-C32") and 13 measures for Part D ("D01-D13"). *See* CMS, *2027 Star Ratings Measures & Weights*, https://www.cms.gov/files/document/2027-star-ratings-measures.pdf.

98. Before evaluating a plan with a given Star Ratings measure, CMS must undertake public notice-and-comment rulemaking concerning that measure. This obligation stems from two separate sources of law relevant to this case.

99. *First*, since 2018, CMS's regulations have provided that, before adding a "new" measure, or making substantial changes to a measure's specifications, CMS must first publicly propose the measure (on its website), elicit public feedback prior to the measurement year, *and then* formally engage in notice-and-comment rulemaking. *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act [42 U.S.C. § 1395w-23] and then subsequently will propose and finalize new measures through rulemaking."); *id.* § 423.184(c)(2) (same for Part D); *id.* §§ 422.164(d)(2), 423.184(d)(2) (same procedure applies for substantial changes to measures).

100. Because the majority of CMS's Star Rating measures predate CMS's 2018 regulations requiring notice-and-comment rulemaking, most have not undergone rulemaking.

101. Moreover, CMS has taken the position that this regulatory notice-and-comment obligation does *not* require *traditional* notice-and-comment rulemaking in the normal APA sense when CMS *changes* a measure or its specifications, *i.e.*, disclosing CMS's intended changes and updates to measures and seeking comment on those changes, but rather merely requires CMS to provide notice to the public it intends to do *something*—anything—to change the measure, and then CMS can do as it wishes to change the measures, regardless of whether that change is a logical outgrowth of CMS's original proposal. *See* Defs.' Mot. For Summ. J. at 23-24, *Clover Ins. Co. v. HHS*, No. 2:25-cv-142 (S.D. Ga. Apr. 9, 2026), ECF No. 51.

102. *Second*, CMS has a statutory obligation to promulgate Star Ratings measures "by regulation," *i.e.*, through notice-and-comment rulemaking and promulgation in the Code of Federal Regulations.

103. CMS must promulgate "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter" pursuant to 42 U.S.C. § 1395hh(a)(2); *Allina*, 587 U.S. at 569-70 (recognizing that "Congress chose to write a new, Medicare-specific" "notice-and-comment regime" under § 1395hh).

### D. CMS's Determination of Alignment's 2026 Star Rating and the *Clover* Lawsuit

104. On October 9, 2025, CMS issued Alignment's 2026 Star Ratings for three of its plans at 4 Stars.

105. As a direct consequence of that 4-Star Rating, CMS awarded Alignment over $170 million in quality bonus payments and rebates.

106. Meanwhile, Clover filed suit in the United States District Court for the Southern District of Georgia on November 7, 2025, challenging the application of a number of measures

used to calculate the 2026 Star Ratings. Compl., *Clover Ins. Co. v. HHS*, No. 2:25-cv-142 (S.D. Ga. Nov. 7, 2025), ECF No. 1.

107. Clover challenged its 2026 Star Rating—which determines payments to the plan for plan year 2027. *See id.*

108. The Southern District of Georgia ultimately granted in part Clover's motion for summary judgment, based on two primary holdings. *See Clover Ins. Co.*, 2026 WL 1483515, at *1.

109. First, the Southern District of Georgia held that ten measures could not be validly applied to Clover to determine its 2026 Star Rating because they exceeded CMS's statutory authority under 42 U.S.C. § 1395w-23(o) and § 1395w-22(e). *Id.* at *8-14.[4]

110. Second, that court held that ten measures could not be validly applied to Clover to determine its 2026 Star Rating because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2). *Id.* at *22-25.

111. More specifically, Congress provided a specific notice-and-comment requirement for Medicare, providing that any "rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive" such benefits, must be promulgated "by regulation," *i.e.*, published notice in the Code of Federal Regulations and subjected to notice and comment. 42 U.S.C. § 1395hh(a)(2).

---

[4] In a separate holding, that court determined that CMS is required to maintain measures that are based on the "types of data" CMS used in 2003, rather than new types of data post-dating 2003, but that CMS had not violated that mandate with respect to the 3 specific measures Clover challenged on that ground. *Id.* at *15-21 (citing 42 U.S.C. § 1395w-22(e)(3)(B)(i)).

112. The Southern District of Georgia correctly held that Star Ratings measure specifications qualify as "statement[s] of policy" for purposes of § 1395hh(a)(2), a point that CMS did not dispute. *See Clover Ins. Co.*, 2026 WL 1483515, at *22 (citing *Allina*, 587 U.S. at 572).

113. "Star Ratings measure specifications qualify as statements of policy" that must be promulgated by regulation under § 1395hh(a)(2) because they "let the public know the agency's current adjudicatory approach to a critical question involved in calculating ratings for M[edicare] A[dvantage] plans nationwide." *Id.*

114. The court also correctly held that, with respect to the ten measures that Clover challenged on this ground (known as Annual Flu Vaccine, Improving or Maintaining Physical Health, Improving or Maintaining Mental Health, Reducing the Risk of Falling, Improving Bladder Control, Getting Needed Care, Getting Appointments and Care Quickly, Customer Service, Rating of Health Care Quality, and Care Coordination),[5] those measures' specifications each provided a "substantive legal standard," a point that CMS, again, did not contest. *Id.* at *22-23.

115. The measure specifications constitute a "substantive legal standard" because "CMS's Star Rating calculations function to define the scope of [Medicare Advantage organizations'] legal rights to rebates by impacting the percent of per capita savings a plan can receive." *Id.* at *23.

116. Finally, the court found that the subject standards did in fact "govern the payment for services because they serve as a 'deciding principle' for such payments." *Id.* at *24 (quoting *Govern*, Webster's III New Int'l Dictionary 982).

---

[5] The numerical designations assigned to these measures varied slightly in the 2026 Star Ratings year, but the measures themselves remained unchanged.

117. As the court explained, "CMS is . . . obligated by statute to offer additional funding to plans with better Star Ratings" and "[t]he fact that the ratings trigger statutorily mandated funding increases is more than mere influence or an indirect effect; it is a deciding principle in the payment amount." *Id.*

118. Therefore, CMS's decision to use the ten disputed measures to determine Clover's 2026 Star Rating "trigger[ed] the notice-and-comment requirements in Section 1395hh(a)(2)," and CMS's failure to engage in the required notice-and-comment rulemaking with respect to those measures made the calculation of Clover's 2026 Star Rating with these measures procedurally invalid. *Id.* at *25.

**E. CMS's Recalculation of Alignment's 2026 Star Ratings**

119. Given plans' experience with the "recalculation" following the 2024 *SCAN* and *Elevance* cases, plans were closely watching *Clover* with the expectation that, if that case were resolved in Clover's favor, CMS was likely to engage in a similar recalculation for all plans.

120. That expectation was not fulfilled by CMS.

121. CMS's second recalculation occurred 3 weeks after the *Clover* court's ruling, as of June 17, 2026.

122. On that date, CMS issued a memorandum, announcing an update to the 2026 Star Rating calculations (which impact 2027 plan payments) in light of the *Clover* decision, and that CMS had issued recalculated Star Ratings for certain plans. Recalculation Memo at 1.

123. The memorandum explained that CMS "recalculated the 2027 [Star] ratings for MA [Medicare Advantage] organizations using only data collected under 42 U.S.C. § 1395w-22(e) as of November 1, 2003," in accordance with the *Clover* court's first holding. *Id.* (CMS also removed certain measures that it apparently believed were embraced by the reasoning of that first holding, even though the *Clover* court did not rule on those measures).

124. The memorandum also invited plans whose overall Star Ratings had increased as a result of the recalculation to resubmit their bids for plan year 2027, in light of the significant revenue effects that the Star Ratings changes would have on the bids.[6]

125. However, the Recalculation Memo did not provide for a recalculation removing the additional ten measures impacted by the Southern District of Georgia's decision—specifically the measures that the *Clover* court held invalid because CMS had not promulgated those measures "by regulation." *Compare* Recalculation Memo, *with Clover Ins. Co.*, 2026 WL 1483515, at *22-25.

**F. Alignment Challenges CMS's Failure to Recalculate Its 2026 Star Ratings**

126. Alignment first raised the preceding error through a submission to CMS on July 7, 2026, asking that its 2026 Star Rating be recalculated in accordance with the Georgia federal court's second holding, which was plainly correct under governing law.

127. CMS responded the same day, denying Alignment's request.

128. So, on July 10, 2026, Alignment brought suit against CMS, challenging CMS's determination of Alignment's 2026 Star Ratings under the APA based on CMS's failure to remove ten unlawfully promulgated measures: Annual Flu Vaccine, Improving or Maintaining Physical Health, Improving or Maintaining Mental Health, Reducing the Risk of Falling, Improving Bladder Control, Getting Needed Care, Getting Appointments and Care Quickly, Customer Service, Rating of Health Care Quality, and Care Coordination. Compl., *Alignment Healthcare, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-02441-CRC, ECF No. 1 at 30 (Prayer for Relief) (D.D.C. 2026).

---

[6] More generally, CMS applied the recalculation on a "hold harmless" basis, meaning that CMS would not implement the recalculated rating where it decreased a plan's overall Star Rating.

129. Specifically, Alignment alleged that the Star Ratings measures specifications are rules, requirements, or statements of policy that establish substantive legal standards governing the scope of benefits, payment for services, and eligibility of entities to furnish Medicare services or benefits under § 1395hh(a)(2), since they determine payments to plans, benefits, and plan eligibility. *Id.* ¶¶ 159-64. That is, Alignment asked the Court to remedy the same defect identified by the Southern District of Georgia in *Clover*. *See id.* ¶ 34.

130. Alignment thus requested an order vacating its 2026 Star Ratings and requiring CMS to recalculate them without reliance on the ten unlawful measures, which would result in Alignment's 2026 Star Ratings for the three plans at issue increasing from 4.0 to 4.5 Stars. *Id.* at 30 (Prayer for Relief). It also sought corresponding rebate relief, including an injunction requiring CMS to facilitate any modified bid documents necessary to give effect to the corrected 4.5-Star Ratings. *See* Am. Compl., *Alignment Healthcare, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-02441-CRC, ECF No. 13 at 30 (Prayer for Relief) (D.D.C. 2026).

131. On August 3, 2026, after an expedited status conference concerning when the Court would need to issue a decision for CMS to effectuate any relief ordered, the Court set an expedited summary judgment briefing schedule. *Alignment Healthcare, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 1:26-cv-02441-CRC, Aug. 3, 2026 Minute Order (D.D.C. 2026). Briefing on the parties' cross-motions for summary judgment concluded just three days ago, on October 6, 2026, and those motions remain pending before the Court. *See id.*

**G. CMS Unlawfully Determines Alignment's 2027 Star Ratings**

132. On October 8, 2026, CMS issued Alignment's 2027 Star Ratings at 3.5 Stars (Contract No. H3815) and 4.0 Stars (Contract Nos. H8832, H3443, H9686).

133. Despite the Southern District of Georgia's decision in *Clover* holding these ten measures unlawful, and despite Alignment's 2026 suit challenging CMS's continued use of those

same measures, CMS unlawfully determined Alignment's 2027 Star Ratings using the ten unlawfully promulgated measures identified above (C03, C04, C05, C15, C16, C21, C22, C23, C24, and C26).

134. In determining Alignment's 2027 Star Ratings, CMS utilized measures without adopting those measures' specifications as regulations through required notice-and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2).

135. Under the Medicare Act, "no rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation." 42 U.S.C. § 1395hh(a)(2).

136. CMS's Star Ratings measures determine CMS's payments to Alignment, Alignment's benefits offered to beneficiaries, Alignment's payments to providers, and Alignment's eligibility to participate in the Medicare Advantage program. *Id.* §§ 1395w-23(o)(1); 1395w-24(b)(1)(C); 42 C.F.R. §§ 422.260, 422.266(a)(2)(ii); *SCAN Health Plan*, 2024 WL 2815789, at *1 (highlighting that CMS is "obligated" to "offer additional funding to plans with better Star Ratings" and "higher-rated plans can then use those extra funds to lower costs for their beneficiaries or to provide them with additional benefits").[7]

137. In addition, CMS terminates plans that have Part C Star Ratings below three Stars for three consecutive years. *See* 42 C.F.R. § 422.510(a)(4)(xi).

[7] The Star Ratings also impact Alignment's ability to expand its operations, and the ability to enroll members year-round at the 5-Star level.

138. The specification of each of the Star Ratings measures identified herein thus amounts to a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter." 42 U.S.C. § 1395hh(a)(2); *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) (recognizing that HHS's measures "used to calculate the payment that providers will receive for providing healthcare services to low-income patients" fell under § 1395hh(a)(2)), *aff'd*, 587 U.S. 566 (2019).

139. Because the specification of each Star Ratings measure determines "the scope of benefits" and "payment for services," and Alignment's "eligibility" to participate in Medicare Advantage, these measures must be promulgated "by regulation." *See* 42 U.S.C. § 1395hh(a)(2).

140. Consistent with § 1395hh(a)(2), CMS has codified in the Code of Federal Regulations almost every material aspect of its Star Rating system, including procedures governing how the Star Ratings are calculated. *See generally* 42 C.F.R. §§ 422.160-166, 423.180-186.

141. But CMS has chosen to treat the *specification* of *measures* differently, on the theory that publishing measure specifications as regulations in the Code of Federal Regulations would diminish CMS's ability to morph these specifications from year to year. 83 Fed. Reg. at 16,537 ("CMS will not codify a list of measures and specifications in regulation text in light of the regular updates and revisions contemplated [by CMS].").

142. The problem with CMS's failure to codify the measures' specifications as regulations through notice and comment rulemaking is that Congress requires CMS to do so. 42 U.S.C. § 1395hh(a)(2) ("No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the

scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).").

143. CMS did not promulgate "by regulation" *any* of the specifications for the following measures that it applied to Alignment in determining Alignment's 2027 Star Ratings:

- Annual Flu Vaccine (C03),
- Improving or Maintaining Physical Health (C04),
- Improving or Maintaining Mental Health (C05),
- Reducing the Risk of Falling (C15),
- Improving Bladder Control (C16),
- Getting Needed Care (C21),
- Getting Appointments and Care Quickly (C22),
- Customer Service (C23),
- Rating of Health Care Quality (C24),
- Care Coordination (C26).

144. Moreover, even if CMS were to take the position that promulgating these measures' specifications "by regulation" is met by publishing these measures in the Federal Register, CMS did not do that, either.

145. To be sure, CMS has listed out the names and high-level descriptions of the measures in prior Federal Register announcements. But CMS has not provided in the Federal Register the specifications for how the measures are determined. 83 Fed. Reg. at 16,531-32.

146. To actually determine the Star Ratings measures each year, CMS must use, at minimum, the summary specifications in CMS's Star Ratings Technical Notes, which CMS

publishes annually, and potentially also the *detailed* specifications and Technical Notes for *each measure*, found in CMS's sub-regulatory guidance outside of the Star Ratings Technical Notes. *See, e.g.*, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2022) (specifying calculation of two measures).

147. So even if publication in the Federal Register sufficed to promulgate a standard "by regulation," CMS has failed to publish within the Federal Register the actual specifications necessary to determine the measures identified above.

148. As the D.C. Circuit explained, "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents 'having general applicability *and legal effect*,' 44 U.S.C. § 1510 (1982) (emphasis added), and which the governing regulations provide shall contain only 'each Federal regulation of general applicability and current or future effect,' 1 C.F.R. § 8.1 (1986)." *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 538-39 (D.C. Cir. 1986); *see also Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (same).

149. Accordingly, CMS cannot apply the measures identified above to Alignment because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2).

150. CMS thus erroneously deprived Alignment of a 4.0 Star Rating for Contract No. H3815 and 4.5 Star Ratings for Contract Nos. H8832, H3443, and H9686, instead leaving Alignment with 3.5 and 4.0 Star Ratings based on unlawfully promulgated measures.

151. Had CMS calculated Alignment's 2027 Star Ratings without these ten unlawful measures, Alignment's Star Rating would have improved to 4.0 Stars for Contract No. H3815 and 4.5 Stars for Contract Nos. H8832, H3443, and H9686, entitling Alignment to a quality bonus

payment for Contract No. H3815 and a higher rebate percentage for Contract Nos. H8832, H3443, and H9686, resulting in well over $200 million, which would benefit Alignment and its members.

### H. Alignment Suffers And Will Continue To Suffer Harm From CMS's Unlawful Determination Of Its 2027 Star Ratings

152. CMS's unlawful determination of Alignment's 2027 Star Ratings at 3.5 and 4 Stars has harmed and will continue to harm Alignment and its members.

153. Alignment's Star Rating is the determinative factor in calculating CMS's payments to Alignment, and for that matter, other Medicare Advantage plans.

154. A Star Rating of 3.5 Stars leaves Alignment ineligible for a quality bonus payment for Contract No. H3815 and a Star Rating of 4.0 Stars leaves Alignment ineligible for increased rebates for Contract Nos. H8832, H3443, and H9686. This will result in a direct loss of over $200 million in 2028, that Alignment would have been entitled to with 4.0 and 4.5 Star Ratings.

155. CMS's unlawful determination of Alignment's Star Ratings at 3.5 and 4.0 Stars, as well as its unlawful determination of measures identified above at below 4.0 Stars, has also caused significant harm to Alignment's reputation and goodwill, which will compound if it is left in place.

156. Star Ratings (both measure-specific and overall) are publicized on CMS's website, and CMS informs beneficiaries that Star Ratings reflect a plan's quality.

157. By assigning Alignment a 3.5 or 4 Star Rating for the plans at issue, and the individual measure ratings discussed above, CMS has erroneously indicated to beneficiaries that Alignment's plans' quality is inferior to that of other competing plans.

## COUNT I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT AGENCY ACTION THAT IS WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW AND NOT IN ACCORDANCE WITH LAW
## Violation of 5 U.S.C. § 706

158. Paragraphs Nos. 132 to 157 are incorporated by reference as if set forth in full herein.

159. The APA prohibits Defendants from acting in any way that is without observance of procedure required by law or not in accordance with law. 5 U.S.C. § 706(2)(A), (C), (D).

160. Congress has mandated that CMS must engage in notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Allina*, 587 U.S. at 570 (quoting 42 U.S.C. § 1395hh(a)(2)).

161. CMS did not engage in notice-and-comment rulemaking and codify "by regulation" in the Code of Federal Regulations several measures and their specifications that it applied to Alignment in determining its 2027 Star Ratings: Annual Flu Vaccine (C03), Improving or Maintaining Physical Health (C04), Improving or Maintaining Mental Health (C05), Reducing the Risk of Falling (C15), Improving Bladder Control (C16), Getting Needed Care (C21), Getting Appointments and Care Quickly (C22), Customer Service (C23), Rating of Health Care Quality (C24), and Care Coordination (C26).

162. Moreover, to the extent that CMS might now claim that it did so, CMS did not comply with its notice and comment requirements in 42 C.F.R. § 422.164(c)(2), (d)(2) either.

163. The Court should set aside Alignment's unlawful 2027 Star Ratings, order CMS to recalculate Alignment's Star Ratings without inclusion of these measures, and award any equitable and injunctive relief necessary to afford rebate relief.

## PRAYER FOR RELIEF

WHEREFORE, Alignment respectfully requests that this Court enter judgment in its favor and grant the following relief:

i) A declaration pursuant to 28 U.S.C. § 2201 that the use of the following measures to determine Alignment's 2027 Star Ratings was unlawful and in violation of the APA:

Annual Flu Vaccine (C03), Improving or Maintaining Physical Health (C04), Improving or Maintaining Mental Health (C05), Reducing the Risk of Falling (C15), Improving Bladder Control (C16), Getting Needed Care (C21), Getting Appointments and Care Quickly (C22), Customer Service (C23), Rating of Health Care Quality (C24), and Care Coordination (C26).

ii) An order setting aside and vacating Alignment's 2027 Star Ratings.

iii) An order directing CMS to recalculate Alignment's 2027 Star Ratings.

iv) An order directing CMS to determine Alignment's 2027 Star Ratings as 4.0 Stars for Contract No. H3815 and 4.5 Stars for Contract Nos. H8832, H3443, and H9686.

v) An injunction providing for rebate relief, including an order requiring CMS to facilitate any modified bid documents necessary to effectuate the judgment.

vi) An order awarding Alignment its costs and attorneys' fees and expenses as allowed by law.

vii) Such other and further relief as the Court deems just and proper.

Dated: October 9, 2026

Respectfully submitted,

/s/ Andrew D. Prins

Andrew D. Prins (D.C. Bar No. 998490)
Rachael L. Westmoreland (D.C. Bar No. 90034032)
Dorothy M. Canevari (D.C. Bar No. 90043751)
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
rachael.westmoreland@lw.com
dolly.canevari@lw.com

Nicholas L. Schlossman (D.C. Bar No. 1029362)
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email: nicholas.schlossman@lw.com

*Counsel for Alignment Healthcare, Inc.; Alignment Healthcare USA, LLC; Alignment Health Plan; Alignment Health Plan of Arizona, Inc.; Alignment Health Advantage Plan, Inc.; and Alignment Health Plan of Nevada, Inc.*